## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SCHNITZER STEEL INDUSTRIES, INC., )<br>Plaintiff, )<br> )<br>v. )<br> )<br>JAMES DINGMAN; and )<br>NORTH COUNTRY CATALYST, LLC, )<br>Defendants. )<br> ) | C.A. No. 22-361-JJM-LDA |

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

Before the Court is Plaintiff Schnitzer Steel Industries, Inc.'s ("Schnitzer")
Motion for Temporary Restraining Order ("TRO") (ECF No. 3) that seeks to restrain
a former employee, James Dingman, from operating a metal recycling business in
violation of the covenant not to compete to which he agreed as part of his employment
with Metals Recycling LLC ("Metals"), a wholly owned subsidiary of Schnitzer. Along
with their response, Defendants also moved for expedited discovery, leave to file a
sur-reply memorandum, and re-argument. *See* ECF Nos. 19-20. The Court DENIES
Schnitzer's Motion for Temporary Restraining Order.  ECF No. 3.  However, the
Court reserves judgment on Schnitzer's Motion for Preliminary Injunction so that
discovery can proceed. *Id.* Should additional facts vindicate Schnitzer's position, the
Court will reconsider its request for a preliminary injunction at that time. Because
the Court is not granting relief against Defendants at this time, it also DENIES both
their motions. ECF Nos. 19-20.

## I. FACTS

The parties strongly dispute the relevant facts. *See* ECF Nos. 17-18. A high-level synopsis, however, provides a helpful introduction to the issues. Schnitzer, operating through various subsidiaries, runs a metals recycling business in which it purchases various parts, such as catalytic converters from automobiles, and salvages any useful metals from them to resell as raw material. ECF No. 3, Declaration of Mike Maestrey at 1-2, ¶¶ 3-5 (hereinafter "Maestry Dec. I"). Mr. Dingman has worked in the scrap metal industry for over a decade, during which time he developed a specialty in the purchase and sale of catalytic converters. *See* ECF No. 17, Declaration of James Dingman at 1-2, ¶ 3 (hereinafter "Dingman Dec."). Metals, one of Schnitzer's many subsidiaries, hired Mr. Dingman to specialize in the purchase of catalytic converters. *Id.* at 2, ¶ 4; Maestry Dec. I at 4, ¶ 15. As part of his employment agreement with Metals, Mr. Dingman signed a covenant not to compete, which barred him from engaging in a similar business during his employment and for twelve months after his employment with the company (hereinafter the "Restriction Period"). *See* ECF No. 3, Ex. A at 1-2.

Mr. Dingman then moved to New Hampshire and transferred from Metals to Prolerized New England Company, LLC ("Prolerized"), another Schnitzer subsidiary. ECF No. 18, Second Declaration of Mike Maestry, at 4, ¶ 20 (hereinafter "Maestry Dec. II"); Dingman Dec. at 4, ¶¶ 9-10. Schnitzer, however, then terminated Mr. Dingman for allegedly violating the company's code of conduct and work rules. Dingman Dec. at 5, ¶ 12; Maestry Dec. II at 5, ¶ 28. Specifically, Schnitzer allegedly

2

found that Mr. Dingman bought catalytic converters whose serial numbers were illegible or not ascertainable, and in some instances made up serial numbers in place of the correct ones.  Dingman Dec. at 5, ¶ 12; ECF No. 18, Ex. I at 3.  Mr. Dingman then formed his own company, North Country Catalyst, LLC ("North Country"), to engage in the business of buying and selling catalytic converters.  Dingman Dec. at 5, ¶ 13; Maestry Dec. I at 5, ¶ 26.  After receiving no response to a cease-and-desist letter that it sent Mr. Dingman, Schnitzer filed this suit claiming that Mr. Dingman is in breach of his covenant not to compete that he signed as part of his employment agreement with Metals.  *See* ECF No. 1 at 8-9, ¶¶ 44-50.

## II.     STANDARD OF REVIEW

The basic four-factor legal standard for a TRO mirrors that for a preliminary injunction.  *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016).  As with a preliminary injunction, the movant must demonstrate that weighing the following four factors favors the granting of a TRO: (1) likelihood of success on the merits; (2) potential for irreparable injury; (3) balance of the relevant equities; (4) effect on the public interest if the TRO is granted or denied.  *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991).  A "district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'"  *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).  Nonetheless, in ruling on "interim injunctive relief, the court must be guided by the traditional equity doctrine that preliminary injunctive relief is an

3

*extraordinary and drastic* remedy that is never awarded as of right." *Harris*, 217 F. Supp. 3d at 552 (emphasis added) (citing *Letourneau v. Aul*, No. 14–421L, 2015 WL 5167854, at *2 (D.R.I. Sept. 3, 2015)).

## III.   ANALYSIS

In walking through the four TRO factors, the Court's analysis will focus on the breach of contract claim related to the covenant not to compete because it is the most substantial issue.  Rulings on the other claims that Schnitzer brings will also follow directly from the resolution of this core issue.

### A.   Likelihood of Success on the Merits

This factor presents three issues, the first two of which relate to the covenant not to compete.  The first concerns the applicability of the covenant not to compete to the duration of Mr. Dingman's employment with Schnitzer companies.  The second concerns the enforceability of the covenant not to compete.  The third concerns the likelihood of success on the other claims.

#### 1.   Applicability of the Covenant Not to Compete

Schnitzer argues that, when Mr. Dingman started operating North Country as a buyer and seller of catalytic converters after his termination on June 7, 2022, he violated the covenant by operating a competing business within the Restriction Period.  ECF No. 3 at 7-8.  Before proceeding with the analysis, however, it is necessary to revisit the specific language of the agreement whose effect the parties' dispute.  The covenant not to compete states the following:

> During Employee's employment by the Company and for a period of twelve (12) months following termination of Employee's employment for

4

any reason (the "Restriction Period"), Employee will not, directly or indirectly, own, manage, control, or participate in the ownership, management or control of, or be employed by, consult for, or be connected in any manner with a Competitor business. "Competitors" include EMR, Sims, AIM, and Excel Recycling that operate metal recycling businesses in the Northeast United States region to which the Employee is assigned by the Company, or other similar metals recycling businesses that may commence operations in that region during the Employee's employment with the Company, and any similar business in any region to which Employee is subsequently assigned.

ECF No. 3, Ex. A at 1-2.

Mr. Dingman is clearly identified as the "Employee" in the agreement. *See id.* at 1. However, the language surrounding the "Company" is less clear. *See id.* The agreement states that the parties are:

James Dingman ("Employee"), who will reside and have a principle [sic] place of business in Rhode Island, and Metals Recycling LLC (for the benefit of itself, its parents, divisions, subsidiaries, affiliates, successors and assigns) (the "Company").

*Id.*

Interestingly, Metals is mentioned under the complaint's description of the parties but not named as a plaintiff in this case. *See* ECF No. 1 at 1, ¶ 1. Schnitzer's papers also seem to blur any legal distinctions among its subsidiaries. *See generally* ECF Nos. 3, 18. Yet, Metals is the only entity that is explicitly listed in Mr. Dingman's employment agreement. *See* ECF No. 3, Ex. A at 1. While the above cited "for the benefit" language precedes the definitional parenthetical, it would be peculiar to read all parents, subsidiaries, affiliates, etc. into the definition of the "Company," written as a singular. Accordingly, absent an assignment of the contract or change in Metals' legal status, the best reading of this language indicates a covenant between

5

Metals and Mr. Dingman under which Mr. Dingman agreed not to compete with Metals or any of its parents, subsidiaries, affiliates, etc. (i.e., the beneficiaries of the covenant). The Court is unaware of any precedent in Rhode Island law that would suggest that the covenant not to compete should carry over from one legal entity to another without express contractual language to that effect. In other words, under the agreement, the Restriction Period began when Mr. Dingman ended his employment with Metals.[1] The "for the benefit language" is thus best read as prohibiting Mr. Dingman from competing with those named beneficiaries during the Restriction Period, not as extending the Restriction Period for as long as Mr. Dingman was employed with a Schnitzer company.

With that said, contrary to what Mr. Dingman argues, the Massachusetts Noncompetition Agreement Act ("MNAA")—Mass. Gen. Laws. Ann. ch. 149, § 24L (West 2022)—and the material change doctrine[2]—*see F.A. Bartlett Tree Expert Co. v. Barrington*, 353 Mass. 585 (1968)—did not void his earlier contract with Metals.

---

[1] Notwithstanding this characterization, Mr. Dingman's legal employment status seems to be somewhat of a question. Schnitzer claims that this transfer to Prolerized "was for administrative purposes only" and the only documentation that changed was Dingman's W-2 (a fact that Mr. Dingman contradicts, *see* Dingman Dec. at 4, ¶ 10). Maestry Dec. II at 4, ¶¶ 21-22. Whatever the case, there is no reason to think that Mr. Dingman remained employed by Metals specifically after he was transferred to Prolerized.

[2] Although, there is a question of whether this doctrine stands for anything beyond the general contract law principles of abandonment and rescission. *See Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 424 (D. Conn. 2004) (noting that *F.A. Bartlett* and a related case "stand for nothing more than the unremarkable proposition that contracting parties are free to abandon their prior contracts and form new ones, and an intention to do so may be evidenced not only by words or writing but also by the parties' conduct").

Pursuant to Section 6(a) of Mr. Dingman's agreement with Metals, the agreement is to be construed according to Rhode Island law. ECF No. 3, Ex. A at 4. The United States Court of Appeals for the First Circuit also has held that the material change doctrine does not override a contract's choice of law provision. *See NuVasive, Inc. v. Day*, 954 F.3d 439, 445 (1st Cir. 2020). The MNAA and the material change doctrine would thus only apply if they had equivalents in Rhode Island law. Without further direction from the appropriate courts that Rhode Island law requires these rules, the Court will not step outside the current legal bounds.

Instead, what does appear in Rhode Island law is the standard principle that both parties might rescind an earlier contractual obligation. *See McFarland v. Brier*, 850 A.2d 965, 972 (R.I. 2004) (citations omitted). Under a rescission analysis, the new employment relationship with Prolerized—which possibly had to comply with Massachusetts law[3]—might constitute relevant evidence in determining whether the parties rescinded Mr. Dingman's contractual obligations with Metals, as a matter of Rhode Island contract law principles. *See* ECF No. 17 at 9-10. But the necessary supporting facts for Mr. Dingman's legal theory of rescission are not present. Mr. Dingman only states in his affidavit that he "believed that [he] was no longer subject to a noncompetition agreement because of the new employment relationship [with Prolerized], and because Prolerized did not require [him] to sign one." Dingman Dec.

---

[3] There is also a dispute over whether the MNAA even applies to Mr. Dingman's employment with Prolerized, as Mr. Dingman never lived or worked in Massachusetts. But, because Dingman did not sign a covenant not to compete when he transferred to Prolerized, the Court need not reach this issue.

at 4, ¶ 11. None of these actions conflicts with the terms of the covenant not to compete. In fact, the agreement with Metals specifically noted that Mr. Dingman must provide a copy of the agreement to any subsequent employer during the Restriction Period. ECF No 3, Ex. A at 2. Mr. Dingman cannot, on one hand, claim that Metals and Prolerized are both under the Schnitzer umbrella such that Schnitzer could void his contractual obligations with one of them just by virtue of his transfer to the other, but on the other hand, claim that these two subsidiaries are such distinct legal entities that moving from one to the other constitutes a major change in his employment.

In summary, the Court finds that Mr. Dingman's contract with Metals has not been rescinded and that the Restriction Period started when Mr. Dingman's employment with Metals ended in November 2021. Because the agreement also provided for this period to be tolled for the time Mr. Dingman was in breach—which is alleged to have started June 28, 2022—roughly four months of this period remain. Maestry Dec. I at 5, ¶ 26.

### 2.  Enforceability of the Covenant Not to Compete

Given that Mr. Dingman and Metals did not rescind the covenant not to compete and that time remains in the Restriction Period, the Court's inquiry turns to whether the covenant is enforceable. "Under Rhode Island law, a party seeking to enforce a covenant not to compete must first establish three threshold requirements: (1) the covenant is ancillary to an otherwise valid transaction or relationship, such as an employment contract; (2) the covenant is supported by adequate consideration;

8

and (3) the covenant is designed to protect a legitimate interest of the employer."
*CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020) (internal quotation
marks omitted) (quoting *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1053 (R.I.
1989)). The first two requirements are readily met. The covenant was ancillary to
Mr. Dingman's employment contract with Metals, and he was compensated for his
services with no contention that his remuneration from Metals was inadequate. But
there is a real issue as to whether the covenant protects a legitimate interest in this
case.

Because "covenants not to compete are disfavored and subject to strict judicial
scrutiny [under Rhode Island law].... [S]uch covenants will be enforced as written
only if the contract is reasonable and does not extend beyond what is apparently
necessary for the protection of those in whose favor it runs." *Id.* at 56 (internal
quotation marks omitted) (quoting *Cranston Print Works Co. v. Pothier*, 848 A.2d
213, 219 (R.I. 2004); *Durapin*, 559 A.2d at 1053). Moreover, "[t]he reasonableness of
a covenant [not to compete] depends on factors such as whether it is narrowly
tailored; whether its scope is reasonably limited in activity, geography, and time;
whether the hardship to the employee outweighs the employer's need for protection;
and whether enforcement of the covenant is likely to harm the public interest." *Id.*
(citing *R.J. Carbone Co. v. Regan*, 582 F. Supp. 2d 220, 225 (D.R.I. 2008)). Although,
there is a lack of clarity whether such a covenant's reasonableness should be assessed
as applied or on its face. *See id.* at 62 (reporting two concurrences, each of which
argues for choosing one of these approaches over the other).

Turning to the facts here, the Court finds that under neither approach has Schnitzer met its burden in demonstrating that the covenant is enforceable. The covenant is either facially overbroad and cannot be partially enforced as to Mr. Dingman or the covenant is not enforceable as applied to Mr. Dingman. These two analyses would effectively be the same. Specifically, Schnitzer has failed to show that it has a legitimate business interest in the clients whom Mr. Dingman allegedly serves in violation of the covenant. Schnitzer claims that Mr. Dingman was "able to craft these successful competing quotes [to Schnitzer's] because of Dingman's access to Schnitzer's confidential business information including its pricing structure, cost information and strategy, which he agreed not to use or disclose." Maestry Dec. I at 6, ¶ 29. To the contrary, Mr. Dingman claims that Metals recruited him

> to gain [his] expertise in the catalytic converter market, and train members of a new "cat team" … and … to leverage [his] pre-existing and positive relationships within the automobile salvage industry in New England that supply catalytic converters to metals recycling companies … who may have previously been dissatisfied with Schnitzer's pricing and business practices.

Dingman Dec. at 3, ¶ 7.

Additionally, Mr. Dingman states that he and North Country have not done business with any customer who was not previously a customer of his before he joined Schnitzer.[4] *Id.* at 5, ¶ 15. Further, Mr. Dingman alleges that "Schnitzer does not have any 'special [pricing] technique' that is not generally known to anyone dealing in an ordinary commodity like scrap metal" because firms in the industry use online

---

[4] Mr. Dingman does note three possible exceptions but claims that, in each case, the client either contacted him or was referred to him. *Id.* at 5, ¶ 15.

applications that list up-to-date market prices for catalytic converters. *Id.* at 6, ¶ 17. Schnitzer vigorously disputes this account of the facts. *See* Maestry Dec. II at 3-4, ¶¶ 17-18. Its manager for the catalytic converter business claims that "Mr. Dingman only brought two (2) new accounts to Schnitzer from his previous employment/professional life.... *** Of the twenty-three (23) customers/suppliers from whom Schnitzer sourced catalytic converters from March to June of 2022[5], twenty-one (21) were existing Schnitzer customers/suppliers." *Id.*

Mr. Dingman has raised a serious doubt about whether Schnitzer has a legitimate interest in the information that it claims to be protecting by enforcing the covenant against him. Based on the above language alone from Schnitzer's supporting declaration, it is not even clear whether Schnitzer already did business for catalytic converters with these customers/suppliers or did business with them for other goods or services. *See id.* Schnitzer's manager alleges that twenty-one of Mr. Dingman's current clients were "customers/suppliers," this manager does not explicitly allege that twenty-one were current *catalytic converter* customers/suppliers. *Id.* While a granular one, this distinction proves critical to the issues in this case. If Mr. Dingman brought the catalytic converter business from these accounts, even if the companies already did other business with Schnitzer, Schnitzer would not have a legitimate interest in these business relationships for catalytic converters that it otherwise would not have had without Mr. Dingman's

---

[5] This period only represents a portion of the time that Mr. Dingman was employed by Prolerized. *See* ECF No. 18 at 2. It is unclear why Schnitzer refers to this particular period.

involvement. To be clear, the Court is not adopting this narrower reading of the declaration by Schnitzer's manager. It is sufficient to note that this manager's statement is ambiguous and, at least, could be read in a manner that does not challenge Mr. Dingman's factual account. Moreover, Schnitzer does not appear to provide any concrete evidence challenging Mr. Dingman's assertion that he did not rely on or was not privy to any specialized, confidential pricing techniques. *See* ECF No. 18 at 5-7. Schnitzer merely recites allegations that it employs proprietary strategies and techniques, to which Mr. Dingman was exposed. *See id.* It is true that Schnitzer need not prove that it will prevail in its case at this stage. But the only evidence proffered so far has been competing declarations by Mr. Dingman and one of Schnitzer's managers. Along with material factual disputes, there are also material ambiguities as to certain party positions. Accordingly, even to estimate that Schnitzer is likely to succeed on its breach of contract claim, the Court would have to substantially credit Schnitzer's affidavits, while reading them in a manner favorable to Schnitzer, and substantially discredit Mr. Dingman's affidavit. The Court sees no reason to do so given that there is a robust factual dispute before it that leaves the evidence largely unsettled. This strong remedy cannot be predicated on such a weak factual basis.

### 3. Likelihood of Success on Other Claims

Schnitzer makes two other breach of contract claims and two tortious interference claims against North Country. *See* ECF No. 3 at 16-17. Schnitzer claims that Mr. Dingman breached his contract with Metals by violating the confidentiality

and non-solicitation provisions. *Id.* In support of this contention, however, Schnitzer only rehearses its allegation that Mr. Dingman "used identifying and contact information he acquired while working for Schnitzer to reach Schnitzer's suppliers, and then used his knowledge of Schnitzer's pricing and quoting procedures to submit bids to such suppliers/customers that were more appealing than [Schnitzer's]." *Id.* at 14. But Mr. Dingman outright denies these allegations, asserting that Schnitzer had no proprietary pricing technique—at least none of which he was aware—and that he only did business with clients who were preexisting contacts of his or who independently contacted him (i.e., not requiring Mr. Dingman to misuse confidential information). *See* ECF No. 17 at 14-16. Schnitzer has thus not adduced sufficient evidence to find anything more than a fervently contested factual dispute over Mr. Dingman's alleged use of its confidential information. Likewise, if Mr. Dingman's factual account is correct, then he cannot be enjoined from using preexisting client relationships to the extent that such an act even constitutes "solicitation" within the meaning of the contract. Moreover, for the clients who he claims contacted him, Mr. Dingman has performed none of the actions that the non-solicitation provision prohibits. Accordingly, Schnitzer has also not met its burden on this issue.

Schnitzer further claims that North Country tortiously interfered with both Mr. Dingman and Metals' contract and Metals' business expectancy (i.e., its relationships with suppliers/customers). *See* ECF No. 3 at 16-17. Once again, these claims rise and fall on the same disputed facts that were discussed above. North Country cannot tortiously interfere with unenforceable contract provisions. Nor can

North Country tortiously interfere with business relationships that were only Schnitzer's because of Mr. Dingman's involvement. Schnitzer has thus not met its burden on these issues either.

### B.    Remaining TRO Factors

The remaining TRO factors turn on mostly the same evidentiary issues as those that pertain to the likelihood of success factor. The considerations are also the same for each of Schnitzer's claims and thus are discussed together. First, the Court considers whether Schnitzer has suffered irreparable harm. Second, the Court weighs the equities between the parties and assess the public interest in the matter.

#### 1.  Irreparable Harm

Schnitzer has demonstrated irreparable harm. As part of his agreement with Metals, Mr. Dingman did expressly consent to equitable relief against him without a showing that actual or money damages would not be an adequate remedy. ECF No. 3, Ex. A at 4-5. Numerous courts have also noted that injunctive relief is appropriate in cases involving the breach of the types of covenants at issue here, given that the resulting injury is difficult to quantify. *See, e.g., Harlan Labs., Inc. v. Campbell*, 900 F. Supp. 2d 99, 108 (D. Mass. 2012) (citations omitted) ("As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm."); *CVS Pharmacy, Inc. v. Lavin*, 384 F. Supp. 32 227, 237 (D.R.I. 2019), *aff'd*, 951 F.3d 50 (1st Cir. 2020) (citations omitted) ("Rhode Island courts have enjoined former employees when the employee's knowledge of confidential information is likely to damage the former employer.").

## 2.  Balance of Equities and Effect on the Public Interest

Irrespective of the disputed facts, Mr. Dingman would certainly suffer hardship were he barred from using his only professional skill in the geographic region where he currently resides.  *See* Dingman Dec. at 5, ¶ 13.  This consideration is especially compelling where such a bar is created by a contractual relationship that stems from the uneven power dynamic between employer and employee.  Nevertheless, while this fact looms large, it alone cannot overcome an otherwise enforceable contractual obligation.  But Mr. Dingman bolsters his argument with the allegations that, by granting the TRO, Schnitzer would effectively be "swindling" him out of his preexisting client relationships.  Mr. Dingman certainly would suffer hardship if an employer could bar him from doing business with the exact client relationships for which Schnitzer hired him in the first place.  Schnitzer, on the other hand, would suffer hardship if Mr. Dingman were allowed to learn its confidential information and exploit its existing client relationships only to turn around and use that information and those existing relationships against the company on his being fired.  But Schnitzer has not sufficiently demonstrated this account of the facts.  Moreover, Mr. Dingman did not receive significant additional compensation, let alone any extra compensation for signing the covenant not to compete.  Even were Mr. Dingman's account definitively demonstrated, Schnitzer would have a non-frivolous argument that it effectively purchased Mr. Dingman's preexisting client relationships had it compensated him considerably for signing these restrictive covenants.

Accordingly, weighing the equities slightly favors Mr. Dingman's inherently disadvantageous position.

Regarding the public's interest, the public has a strong rule of law interest in preserving a contract's terms as written and bargained for by the parties without interference from third parties. Additionally, the public has an interest in protecting non-public information, whose confidentiality may be critical to an important business function. However, these interests can only be upheld when the underlying facts justify those policy considerations. The issues here are too unsettled to impose such a strong equitable remedy.

## IV.   CONCLUSION

For all these reasons, the Court DENIES Schnitzer's Motion for Temporary Restraining Order (ECF No. 3). The Court also DENIES Defendants Motion for Leave to File Sur-Reply Memorandum and Request for Reargument (ECF No. 19) and Motion for Expedited Pre-Hearing Discovery (ECF No. 20).

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

November 7, 2022

16